EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Colegio de Médicos-Cirujanos de Puerto Rico, Asociación de Laboratorios Clínicos, Inc.<br><br>Peticionarios<br><br>v.<br><br>Academia de Medicina de la Familia; Academia de Medicina General; Asociación de Hematología y Oncología de Puerto Rico; Asociación de Quiropráctico de Puerto Rico; Colegio de Cirujanos Dentistas de Puerto Rico; Pain Management Academy of Puerto Rico, Inc.<br><br>Interventores<br><br>Hon. Ángela Weyne Roig, en su capacidad de Comisionada de Seguros; Hon. César R. Miranda Rodríguez, en su capacidad de Secretario de Justicia; Hon. Ana del C. Ríus Armendaris, en su capacidad de Secretaria de Salud<br><br>Recurridos | Certiorari<br><br>2018 TSPR 180<br><br>201 DPR ____ |

Número del Caso: CC-2018-676

Fecha: 7 de noviembre de 2018

Tribunal de Apelaciones:

      Región Judicial de San Juan y Caguas

Abogados de la parte peticionaria:

      Lcda. Veronica Ferraiuoli Hornedo
      Lcda. Carla Ferrari Lugo
      Lcdo. José E. Torres Valentín

Oficina del Procurador General:

      Lcdo. Luis R. Román Negrón
      Procurador General

      Lcdo. Isaías Sánchez Baez
      Subprocurador General

      Lcdo. Guillermo A. Mangual Amador.
      Procurador General Auxiliar

Materia: Derecho Administrativo – Análisis de la validez de requisitos y limitaciones impuestas a la negociación colectiva de los proveedores de salud y organizaciones de servicios de salud.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Colegio de Médicos-Cirujanos de Puerto Rico, Asociación de Laboratorios Clínicos, Inc.<br><br>        Peticionarios<br><br><br>             v.<br><br><br>Academia de Medicina de la Familia; Academia de Medicina General; Asociación de Hematología y Oncología de Puerto Rico; Asociación de Quiropráctico de Puerto Rico; Colegio de Cirujanos Dentistas de Puerto Rico; Pain Management Academy of Puerto Rico, Inc.<br><br>        Interventores<br><br>Hon. Ángela Weyne Roig, en su capacidad de Comisionada de Seguros; Hon. César R. Miranda Rodríguez, en su capacidad de Secretario de Justicia; Hon. Ana del C. Ríus Armendaris, en su capacidad de Secretaria de Salud<br><br>        Recurridos | CC-2016-0676 | Certiorari |

El Juez Asociado Señor ESTRELLA MARTÍNEZ emitió la Opinión del Tribunal.

San Juan, Puerto Rico, a 7 de noviembre de 2018.

La controversia planteada en el recurso de autos nos lleva a evaluar la validez de varios artículos del reglamento que enmarca la negociación colectiva de los

proveedores de salud, según autorizada por la Ley Núm. 203-2008, _infra_. Por tanto, hoy debemos resolver si los artículos cuestionados ante este Tribunal cumplen con el poder delegado y el propósito de la política pública promovida en tal estatuto.

A continuación, el trasfondo fáctico y procesal de la controversia a atender.

# I

Mediante la aprobación de la Ley Núm. 203-2008, 26 LPRA sec. 3101 _et seq._ (Ley Núm. 203-2008), se añadió un nuevo capítulo al Código de Seguros con el fin de autorizar la negociación colectiva entre los proveedores de salud y las organizaciones de servicios de salud.[1] Ello, tras reconocer las desventajas que sufren los

---

[1]La Ley Núm. 203-2008 define el término "proveedor" de la siguiente manera:

> Significa todo médico, hospital, centro de servicios primarios, centro de diagnóstico y tratamiento, dentista, laboratorios, farmacias, servicios médicos de emergencia, pre-hospitalarios, proveedor de equipo médico, o cualquier otra persona autorizada en Puerto Rico para proveer servicios de cuidado de salud, ya sea de manera grupal o individual y que bajo contrato con una organización de servicios de salud y administradores de terceros, preste servicios de cuidado de salud a suscriptores o beneficiarios de un plan de cuidado de salud. 26 LPRA sec. 3102(3).

Por su parte, el término "organización de servicios de salud", 26 LPRA sec. 3102(4), es definido a base del Art. 19.020 del Código de Seguros el cual, a su vez, lo define como: "cualquier persona que ofrezca o se obligue a proveer a uno o más planes de cuidado de salud". 26 LPRA sec. 1902(6).

proveedores de salud al momento de negociar sus contratos con los planes médicos, ante la determinación legislativa de que ciertas aseguradoras controlan el mercado y no permiten una negociación justa entre las partes. A su vez, el referido estatuto reconoce que esas desventajas en la contratación repercuten en la calidad de los servicios de salud que se ofrecen a los pacientes.

La Ley Núm. 203-2008 no sólo pretendió lidiar con la problemática de la desventaja en la negociación, sino que procuró también que esta negociación colectiva no se alejara de las normas antimonopolísticas. Ello, al impregnarla con una supervisión activa y restringir el alcance de la negociación colectiva de los proveedores de salud para no afectar indebidamente el mercado de libre competencia. Así, limitó la cantidad de proveedores que podían unirse a negociar colectivamente a razón del porciento de especialidades por áreas geográficas.

En virtud del poder delegado en tal legislación, el Comisionado de Seguros, el Departamento de Salud y la Oficina de Asuntos Monopolísticos crearon y adoptaron la Regla 91, Normas para regular el proceso de la negociación colectiva entre las organizaciones de servicios de salud o administradores de terceros con los proveedores, representantes de proveedores y la creación del Panel Revisor y la Junta Revisora de Tarifas de Planes Médicos y

Seguros, (Regla 91).[2] A través de esta reglamentación, se estructuró el proceso de la negociación colectiva.

Con ese trasfondo y tras varios años de implementada la Regla 91, el 6 de marzo de 2015, el Colegio de Médicos Cirujanos de Puerto Rico (Colegio), en representación de sus integrantes, solicitó un injunction preliminar, uno permanente y una sentencia declaratoria en contra de la Oficina del Comisionado de Seguros, la Oficina de Asuntos Monopolísticos y el Departamento de Salud. En esencia, alegó que varios de los artículos de la Regla 91 eran contrarios a la negociación colectiva permitida por la Ley Núm. 203-2008. Por tanto, arguyó que tales artículos eran ultra vires al exceder la autoridad conferida por esa ley. A su vez, arguyó que otros de los artículos eran arbitrarios y caprichosos.

Particularmente, el Colegio argumentó que los siguientes artículos de la Regla 91 eran ultra vires: el Art. 2.02(A) que establece como requisito preliminar para la negociación colectiva que se demuestre que hay desbalance en la contratación a través del poder en el mercado de la organización de servicios de salud con la que se pretende negociar y los efectos de ello en las prácticas de salud de los proveedores; el Art. 2.02(B) al

---

[2]Reglamento Núm. 7646 de la Oficina del Comisionado de Seguros de Puerto Rico, 23 de diciembre de 2008.

excluir el Plan de Salud del Gobierno de Puerto Rico de estas negociaciones colectivas; el Art. 2.03(A) al requerir una representación al momento de negociar; el Art. 2.03(B) al añadir requisitos no contemplados en la ley para ser representante, y el Art. 3.03 al requerir la autorización del Comisionado de Seguros para iniciar la negociación. En cuanto al Art. 3.12, sostuvo que los criterios para aprobar el contrato final entre las partes no guardaban relación con el propósito de la Ley Núm. 203-2008,[3] al igual que las áreas geográficas establecidas en el Art. 2.01(D). Basado en estos planteamientos, el Colegio presentó varias mociones de sentencia sumaria.[4]

En respuesta, el Estado argumentó que la Regla 91 tomó como norte lo dispuesto en la Ley Núm. 203-2008 al estructurar el proceso de la negociación colectiva y velar que los resultados fueran compatibles con el estatuto y las restantes leyes aplicables, particularmente las relacionadas con las normas antimonopolísticas. Específicamente, alegó que el requisito del Art. 2.02(A) de la Regla 91, respecto a demostrar el desbalance en la contratación antes de poder negociar colectivamente, era

---

[3]El criterio para aprobar el contrato final entre las partes es que el beneficio social o en pro de la competencia supere los efectos negativos de las prácticas anticompetitivas.

[4]Además de los artículos mencionados, el Colegio impugnó varios otros que no están en controversia ante este Tribunal, dado que el Tribunal de Primera Instancia los declaró nulos.

precisamente reconocido en la Ley Núm. 203-2008, pues la política pública allí proclamada era lograr un balance en la contratación.

De otra parte, apoyó la exclusión del Plan de Salud del Gobierno de Puerto Rico de esta negociación colectiva. Ello, puesto que era obligatorio como consecuencia de las disposiciones de la Ley de la Administración de Seguros de Salud de Puerto Rico, Ley Núm. 72-1993, 24 LPRA 7001 et seq. Explicó que la ley que regula a la Administración de Seguros de Salud de Puerto Rico (ASES) establece, expresamente, que las organizaciones de servicios de salud que contraten con la ASES no estarán bajo la jurisdicción ni regulación del Comisionado de Seguros por los servicios que les presten a sus beneficiarios, sino que estarán sujetas a la propia ASES. De esa forma, argumentó que, al ser la Ley Núm. 203-2008 una enmienda al Código de Seguros y sujeta a la jurisdicción del Comisionado de Seguros, no le es aplicable el plan de salud dirigido por la ASES. A ello, añadió que no surgía del texto de la Ley Núm. 203-2008, ni de su historial legislativo, la inclusión del plan de salud del gobierno en tales negociaciones colectivas, ni que se tuviera la intención de enmendar la Ley Núm. 72-1993.

Respecto al Art. 2.03(A) sobre la representación de los proveedores, aclaró que, contrario a lo argüido por el Colegio, la Regla 91 no obligaba a los proveedores a

negociar mediante un representante, toda vez que ese artículo reconocía que los grupos de proveedores podían hacerlo a nombre de sus negocios, sin necesidad de un representante. Relacionado también con la representación de los proveedores, el Estado indicó que los requisitos añadidos en el Art. 2.03(B) de la Regla 91 para ser representante eran razonables, a saber: mayoría de edad, saber leer y escribir, diploma de escuela superior y no haber sido convicto de algún delito que implique deshonestidad o depravación moral. Enfatizó que estos requisitos proporcionaban confianza y seguridad a las partes involucradas; además, que se trataban de requerimientos mínimos y sugeridos en las vistas públicas.

Por otro lado, justificó la validez del Art. 3.03 de la Regla 91 que faculta al Comisionado de Seguros a autorizar el inicio de la negociación colectiva entre las partes que así lo soliciten. Lo fundamentó en virtud de la función delegada por la Ley Núm. 203-2008 de supervisar y fiscalizar los procesos.

Por último, planteó que los criterios esbozados en el Art. 3.12 para la aprobación final de la negociación eran cónsonos con el propósito mismo de la Ley Núm. 203-2008, pues así se lograba el deber del Estado de supervisar activamente las prácticas no competitivas. Además, defendió las áreas geográficas diseñadas en la Regla 91,

bajo la premisa de que fueron definidas acorde a los datos del Departamento de Salud.

Así las cosas, el Tribunal de Primera Instancia emitió un dictamen en el cual acogió los argumentos del Estado y, así, reconoció la validez de los mencionados artículos. Inconformes con tal determinación, el Colegio, junto a la Asociación de Laboratorios Clínicos, Inc.,[5] presentaron un recurso de apelación. No obstante, el Tribunal de Apelaciones confirmó la sentencia apelada.[6]

A raíz de ello, recurren ante nos los peticionarios, el Colegio y la Asociación de Laboratorios Clínicos, Inc., y sostienen que los foros inferiores erraron al declarar válidos los artículos antes mencionados. En síntesis, alegan que los artículos de la Regla 91 a los que hacen referencia son ultra vires, por exceder la autoridad y jurisdicción conferidas por su ley habilitadora, Ley Núm. 203-2008. A su vez, argumentan que tales artículos de la Regla 91 interfieren con su derecho a la negociación colectiva reconocido en el mencionado estatuto y los mantiene en un estado de indefensión. Más aún, plantean que la Regla 91 imposibilita tal negociación colectiva, al imponer trabas no contempladas en el estatuto.

---

[5]La Asociación de Laboratorios Clínicos, Inc. fue una de las partes interventoras en el Tribunal de Primera Instancia.

[6]La Jueza Colom García disintió sin opinión escrita.

Concretamente, arguyen que el requisito de demostrar el "desequilibrio en la contratación", pautado en el Art. 2.02 (A) de la Regla 91, no está establecido en la Ley Núm. 203-2008 y que es contrario a la política pública allí establecida a favor de la negociación colectiva. Plantean que el desequilibrio ya fue contemplado en la ley, por lo que no debía exigírsele probarlo.

Por otro lado, cuestionan la exclusión del Plan de Salud del Gobierno de Puerto Rico de la Ley Núm. 203-2008. Aseguran que tal estatuto no provee para ello. Aclaran que no se trata de proveedores que interesan negociar directamente con la ASES, sino con las aseguradoras que ofrecen la cubierta Mi Salud.

En cuanto a los requisitos para ser representante de proveedores, los peticionarios alegan que los añadidos en el Art. 2.03 de la Regla 91 están en conflicto con los enumerados en la Ley Núm. 203-2008, por ser más abarcadores.

Por otra parte, en referencia al Art. 3.03 de la Regla 91, cuestionan la facultad del Comisionado de Seguros para autorizar la iniciación de las negociaciones colectivas aquí revisadas. Arguyen que al Comisionado sólo se le dio la facultad de supervisar las negociaciones, no así autorizar las mismas.

Asimismo, impugnan el Art. 3.12 respecto a los criterios para aprobar la negociación. Cuestionan que se

tomen en consideración los beneficios sociales y en pro de la competencia en comparación con los efectos de las prácticas anticompetitivas. Ello, pues razonan que la Ley Núm. 203-2008 precisamente persigue un balance de competitividad en la contratación de los servicios de salud y contempla los beneficios sociales. Por último, aducen que las áreas geográficas definidas en la Regla 91 no resultan razonables ni cónsonas con la Ley Núm. 203-2008.

Conforme a los asuntos planteados, procede delimitar brevemente el trasfondo normativo aplicable al caso ante nos.

**II**

**A.**

Las agencias administrativas solamente pueden ejercer los poderes que su ley habilitadora expresamente les ha otorgado y aquellos que sean indispensables para llevar a cabo su encomienda primordial. Oficina de Asuntos Monopolísticos del Departamento de Justicia v. Jiménez Galarza, res. el 1 de diciembre de 2017, 2017 TSPR 194; DACo v. AFSCME, 185 DPR 1, 12 (2012); Raimundi v. Productora, 162 DPR 215, 224 (2004). Por lo cual, una agencia administrativa no puede asumir jurisdicción sobre una actividad, materia o conducta cuando no está claramente autorizada por ley. Ayala Hernández v. Consejo

de Titulares, 190 DPR 547, 559 (2014); DACo v. AFSCME, supra, pág. 12.

Así pues, las agencias administrativas deben arribar a sus decisiones sin apartarse de la ley habilitadora aun cuando persigan un aparente propósito legítimo. Ayala Hernández v. Consejo de Titulares, supra, pág. 560. Ni la necesidad ni la conveniencia pueden sustituir a la ley en cuanto a fuente de poder cuasilegislativo o cuasiadjudicativo. Oficina de Asuntos Monopolísticos del Departamento de Justicia v. Jiménez Galarza, supra; DACo v. AFSCME, supra; Raimundi v. Productora, supra, pág. 225. De modo que cualquier duda en cuanto a la existencia de tal poder, debe resolverse en contra del ejercicio del mismo. Ayala Hernández v. Consejo de Titulares, supra; Raimundi v. Productora, supra. De esa forma, este Tribunal ha afirmado que toda actuación administrativa que no obedezca el poder que le fue conferido mediante legislación es ultra vires, y por ende, nula. Ayala Hernández v. Consejo de Titulares, supra; DACo v. AFSCME, supra, pág. 13.

Por otro lado, hemos expresado que la ley siempre contendrá criterios amplios y generales que servirán de guía y limitarán el uso de los poderes cuasilegislativos y cuasiadjudicativos delegados a las agencias. Ayala Hernández v. Consejo de Titulares, supra, pág. 561; Bomberos Unidos v. Cuerpo Bomberos et al., 180 DPR 723,

742 (2011). Empero, esos criterios no tienen que ser expresos, sino que pueden surgir del historial legislativo. Íd. Por lo tanto, hemos señalado que a las leyes habilitadoras se les debe brindar una interpretación cónsona con la intención legislativa, la política pública y el interés social que la inspira. Ayala Hernández v. Consejo de Titulares, supra, págs. 561-562.

Conforme a lo anterior y al poder cuasilegislativo de las agencias, un reglamento administrativo no puede estar en conflicto con la ley habilitadora. J.P. v. Frente Unido I, 165 DPR 445, 469 (2005). Es decir, puede complementar la ley, pero no puede estar en contra del mandato legislativo. Íd., pág. 470; Asoc. Fcias. Com. v. Depto. de Salud, 156 DPR 105, 128 (2002). Por ende, un reglamento es nulo si claramente está en conflicto o en contra de la ley que lo permite. Yiyi Motors, Inc. v. E.L.A., 177 DPR 230, 248 (2009); J.P. v. Frente Unido I, supra, pág. 470.

Así, al examinar la validez de la reglamentación de una agencia administrativa, los tribunales estamos obligados a analizar lo siguiente: (1) si la actuación administrativa está autorizada por ley; (2) si se delegó el poder de reglamentación; (3) si la reglamentación promulgada está dentro de los poderes delegados; (4) si al aprobarse el reglamento se cumplió con las normas procesales de la ley orgánica, y (5) si la reglamentación

es arbitraria o caprichosa. Vitas Health Care v. Hospicio La Fe *et al.*, 190 DPR 56, 66-67 (2014).

Respecto al último criterio de arbitrariedad, hemos advertido que las agencias tienen el deber de especificar, mediante reglamentación, los criterios generales esbozados en la legislación delegante. Asoc. Fcias. Com. v. Depto. de Salud, supra, pág. 117. Sin embargo, carecen de facultad para imponer requisitos adicionales a aquellos establecidos por los estatutos que rigen la revisión de la agencia. Vitas Health Care v. Hospicio La Fe *et al.*, supra, pág. 67.

**B.**

Según adelantado, la Ley Núm. 203-2008 añadió el Capítulo XXXI al Código de Seguros con el fin de autorizar la negociación colectiva entre los proveedores y las organizaciones de servicios de salud y reconocer tal autorización como una política pública del Gobierno de Puerto Rico. El propósito fue permitirles a los proveedores de salud negociar colectivamente los términos de sus contratos, como los honorarios y las tarifas por sus servicios. Ello, por la desventaja que tienen, al momento de negociar, ante las compañías aseguradoras. Así, esta legislación pretende "establecer un balance de competitividad en la contratación de los servicios de salud". 26 LPRA sec. 3101.

En la Exposición de motivos se describió la problemática que aspira atender esta legislación. Explica que en Puerto Rico casi el 100% de la población tiene un plan médico, ya sea privado o de la Reforma de Salud del Gobierno de Puerto Rico, y que ciertas compañías de seguros controlan el mercado de los seguros y los planes médicos. A su vez, que esas compañías establecen los honorarios y las tarifas de forma unilateral mediante contratos de adhesión que los proveedores se ven obligados a aceptar para poder subsistir. A ello, añade que las tarifas que pagan los planes médicos han permanecido intactas por muchos años, mientras que los costos operacionales han aumentado vertiginosamente. Advierte que por dicha situación, los proveedores se ven forzados a atender un número significativamente alto de pacientes para poder cubrir los costos de su práctica, lo que afecta la calidad de los servicios que prestan.

Por otra parte, también reconoce que a los proveedores de salud les aplican las leyes antimonopolísticas, por lo que no pueden organizarse para negociar tarifas justas y razonables. Ahora bien, la legislación reconoció que el Tribunal Supremo de los Estados Unidos pautó la autoridad de los estados para poner en vigor leyes que establezcan una política pública contraria a lo establecido en la legislación antimonopolística. A su vez, señaló que tal ejercicio

sería reconocido, siempre y cuando, se exprese en la propia legislación la política del gobierno y esté activamente supervisada por el Estado. Véase, Parker v. Brown, 317 US 341 (1943); FTC v. Ticor Tile Ins. Co., 504 US 621 (1992). Así, la jurisprudencia federal ha reconocido, como excepción, que se puede permitir alguna práctica contraria a las normas antimonopolísticas si están presentes dos requisitos: (1) se trate de un "state action" donde el Estado sea quien promueva la práctica anticompetitiva en virtud de una política pública y (2) exista una supervisión directa ("actively supervised") del Estado sobre esta práctica. North Carolina State Bd. of Dental Examiners v. FTC, 135 S.Ct. 1101 (2015).

La Ley Núm. 203-2008 no sólo reconoce la negociación colectiva de los profesionales de la salud, sino que delinea la misma. De ese modo, establece que los proveedores de salud podrán agruparse por especialidad o área geográfica y que los grupos no podrán exceder del 20% de los proveedores por especialidad o servicio en esa área geográfica en particular. 26 LPRA sec. 3103. A su vez, especifica que el Departamento de Salud, con el asesoramiento de la Oficina de Asuntos Monopolísticos, definirá esas áreas geográficas. Íd. De igual modo, estatuye los términos y condiciones que pueden ser negociados en los contratos, tales como: los honorarios y tarifas; los criterios de las cubiertas; los

procedimientos administrativos; los métodos de reembolso; los programas de garantías de calidad, entre otros. Íd.

Por otro lado, la Ley Núm. 203-2008 delega en la Oficina del Comisionado de Seguros supervisar y fiscalizar las negociaciones. 26 LPRA sec. 3104. Asimismo, que, antes de comenzar la negociación, se tiene que notificar a la Oficina de Asuntos Monopolísticos del Departamento de Justicia. Íd.

Además, la ley en cuestión dispuso para la creación de una comisión de arbitraje, en caso de alguna controversia en el proceso de la negociación que no pudiera ser resuelta por las partes. 26 LPRA sec. 3105. También, creó la Junta Revisora de Tarifas de Planes Médicos y Seguros Médicos con la facultad de autorizar el alza en primas, tarifas o copagos que pudiera resultar de la negociación colectiva o la reducción de cubiertas. 26 LPRA sec. 3106. Esta Junta estará compuesta por el Comisionado de Seguros, la Procuradora del Paciente, el Procurador del Ciudadano y el Departamento de Salud. Íd.

Finalmente, el estatuto delega en la Oficina de Asuntos Monopolísticos, el Secretario de Salud y el Comisionado de Seguros la reglamentación para implantar estas disposiciones. 26 LPRA sec. 3108. Conforme tal mandato, se adoptó la Regla 91 de la Oficina del Comisionado de Seguros.

**C.**

La Regla 91 tiene el propósito de establecer y definir los procesos de la negociación colectiva, según autorizada en la Ley Núm. 203-2008. Así también, que los resultados de tales negociaciones sean compatibles con las leyes estatales y federales.

El Capítulo II de la Regla 91 regula la certificación de los grupos para la negociación colectiva. De entrada, el Art. 2.01 indica, al igual que la Ley Núm. 203-2008, que los proveedores de salud podrán agruparse por especialidad o área geográfica, pero aclara que en cada grupo no podrá exceder el 20% de cada especialidad en alguna área geográfica específica, según las definidas en el inciso (D). Las áreas geográficas están divididas en once regiones que, a su vez, agrupan a todos los municipios de Puerto Rico. Estas según definidas por el Departamento de Salud con el asesoramiento de la Oficina de Asuntos Monopolísticos.

Ahora bien, el Art. 2.02 requiere que se pruebe la existencia de un desequilibrio en la contratación previo a negociar. En cuanto a lo que implica un desequilibrio en la contratación y lo que se debe probar a esos efectos, establece lo siguiente:

A. Existe un desequilibrio en la contratación entre una organización de servicios de salud o administrador de tercero y un grupo de proveedores cuando ocurran las siguientes dos circunstancias:

a. La organización de servicios de salud o el administrador de tercero tiene un poder sustancial en el negocio de los seguros o

planes de cuidado de salud. Existe un poder sustancial en el negocio de seguros o planes de cuidado de salud cuando la participación de la organización de servicios de salud, por si sola o junto con sus afiliadas, exceda de veinticinco mil (25,000) personas cubiertas por alguno de sus planes o exceda del cinco por ciento (5%) del total de personas cubiertas en una determinada área geográfica. Cuando se trate de un administrador de terceros, se considerará el número de personas cubiertas por la entidad o entidades a las que le presta servicio;

b. El poder sustancial antes descrito interviene con la habilidad de los proveedores para ofrecer o brindar un cuidado de salud de calidad. A tales efectos, el grupo podrá probar que:

i. sus miembros se hayan visto obligados a reducir el personal que ofrece servicios de cuidado de salud de su práctica ordinaria;

ii. se haya reducido sustancialmente el tiempo de contacto con los pacientes, con el propósito de atender un mayor volumen;

iii. sus miembros se hayan visto obligados a cerrar alguna o parte de sus prácticas;

iv. se convierte en onerosa la práctica de realizar los procesos necesarios para lograr un diagnóstico certero o adecuado;

v. se haya afectado la prestación de un servicio de cuidado de salud de calidad;

vi. cualquier otra situación que pueda afectar la habilidad de los proveedores para ofrecer o brindar un cuidado de salud de calidad.

La información provista por las partes, con el propósito de cumplir con el requisito de este sub-inciso, se mantendrá confidencial a tenor con la Ley de Monopolios. Regla 91, _supra_, Art. 2.02(A).

Por su parte, ese mismo artículo en su inciso (B) excluye de la negociación colectiva, entre otros, al Plan de Salud del Gobierno de Puerto Rico. Ello, debido a que el plan de salud del gobierno está exento del Código de Seguros de Puerto Rico y reglamentado por la ley de la ASES. Regla 91, supra, Art. 2.02(B).

Por otro lado, el Art. 2.03 atiende lo concerniente a la representación del grupo de proveedores en el proceso de la negociación colectiva. Particularmente, establece lo siguiente:

ARTÍCULO 2.03 Representante requerido

A. Un grupo de proveedores solamente podrá negociar con una organización de servicios de salud por medio de un representante de proveedores debidamente autorizado. Sin embargo, un proveedor podrá negociar a nombre de su negocio, cuando en dicho negocio preste servicio por lo menos otro proveedor o se presten más de un servicio de salud y, además, se cumpla con los requisitos del Artículo 2.01 de este Reglamento. Los convenios logrados por dicho representante, en los límites de las facultades conferidas por sus representados, serán vinculantes para éstos últimos.

B. El aspirante a representante de proveedores deberá cumplir con los siguientes requisitos:

a) Que sea mayor de edad;
b) Que sepa leer y escribir;
c) Que haya obtenido diploma de cuarto año de escuela superior;
d) No haber sido convicto de un delito que implique deshonestidad o depravación moral. Regla 91, supra, Art. 2.03.

Por su parte, el Capítulo III atiende los poderes del Comisionado de Seguros para autorizar el inicio de la negociación y dirigir el proceso en sí. Regla 91, supra,

Art. 3.03. Específicamente, el Art. 3.12 le reconoce al Comisionado de Seguros la facultad de aprobar o desaprobar el contrato que surja a raíz de la negociación. Asimismo, éste deberá velar que los términos del contrato sean consecuentes con el Código de Seguros. La aprobación surgirá cuando los beneficios sociales o en pro de la competencia superen los efectos negativos de las prácticas anticompetitivas. El inciso (B) enumera los siguientes ejemplos sobre lo que pudieran considerarse beneficios sociales:

> a. Se establezcan o mejoren programas de salud preventivos que redunden en la reducción de costos y resulten en beneficio de los consumidores, las organizaciones de servicios de salud y los proveedores;
>
> b. Se establezcan o mejoren los programas para la detección y el manejo del fraude;
>
> c. Se reestablezca el balance competitivo en el mercado de servicios de salud;
>
> d. Se promueva la inversión en la infraestructura y se incentiven los adelantos médicos. Regla 91, _supra_, Art. 3.12.

Por su parte, el inciso (C) de ese mismo artículo menciona que, al balancear los efectos anticompetitivos, el Comisionado de Seguros podrá considerar si:

> a. El contrato provee para pagos de honorarios excesivos;
> b. El pacto contribuye al aumento de los costos de los servicios de salud;
> c. El acuerdo tiende a restringir el acceso y/o la prestación de servicios de cuidado de salud. Regla 91, _supra_, Art. 3.12.

Dentro del marco jurídico antes enunciado, procedemos a resolver las controversias de autos.

## III

Este caso nos exige precisar si los artículos de la Regla 91 señalados por los peticionarios son ultra vires. Específicamente, los artículos relacionados con los siguientes asuntos: (A) la demarcación de las áreas geográficas; (B) el desequilibrio en la contratación como requisito previo para la negociación colectiva; (C) la exclusión del plan de salud del gobierno; (D) los requisitos para ser representante de proveedor; y (E) la autoridad del Comisionado de Seguros para iniciar la negociación y aprobar el pacto final.

Debemos analizar si tales artículos reglamentarios son cónsonos con el propósito y los postulados de su ley habilitadora, la Ley Núm. 203-2008, y si no exceden la autoridad delegada. Ello, requerirá que auscultemos la intención legislativa, a través del texto de la ley, su Exposición de motivos e historial legislativo, para así lograr un análisis íntegro, tanto del estatuto que delegó el poder de reglamentación como del cuerpo reglamentario que se adoptó. Además, debemos evaluar su validez a la luz del criterio de razonabilidad, el cual funge como criterio rector. Danosa Caribbean v. Neg. Asist. Contr., 185 DPR 1008, 1030 (2012).

Como vimos, el propósito de la Ley Núm. 203-2008 fue reconocer la desventaja que tienen los proveedores de salud al momento de negociar los planes médicos, pues no tienen la posibilidad real de lograr un acuerdo justo con algunas aseguradoras. Así, con la herramienta de la negociación colectiva, la Ley Núm. 203-2008 pretende darle a estos proveedores desventajados un mejor balance en los acuerdos y que ello trascienda a mejores servicios médicos. De ese modo, se declara como política pública la autorización de la negociación colectiva entre los proveedores de salud y las organizaciones de servicios de salud.

A los fines de implementar esa política pública, la Ley Núm. 203-2008 delegó en el Comisionado de Seguros, el Departamento de Salud y la Oficina de Asuntos Monopolísticos crear la reglamentación "conveniente y necesaria". 26 LPRA sec. 3108. Consecuentemente, estas agencias aprobaron la Regla 91, la cual regula el proceso de la negociación colectiva autorizada por la Ley Núm. 203-2008.

**A grandes rasgos, las agencias concernientes cumplieron debidamente con la labor delegada. No obstante, en ese afán, impusieron ciertos requisitos y limitaciones que no son cónsonos con la Ley Núm. 203-2008. Por ende, esos requisitos que exceden la autoridad delegada y que no**

**van a la par con el propósito de la ley habilitadora, nos vemos forzados a declararlos nulos. Veamos.**

**A.**

Los peticionarios alegan que las áreas geográficas delineadas en el Art. 2.01(D) de la Regla 91 no guardan relación con la Ley Núm. 203-2008. A tales efectos, argumentan que tal distribución no concuerda con la concentración de los proveedores de salud, de la población, del mercado de las organizaciones de servicios de salud o de las áreas establecidas para el Plan de Salud del Gobierno de Puerto Rico y el Departamento de Salud. Por consiguiente, plantean que las áreas geográficas establecidas son arbitrarias y caprichosas.

El Art. 31.030, añadido al Código de Seguros por la Ley Núm. 203-2008, permite que los proveedores de salud se agrupen por especialidad o área geográfica para encaminar la negociación colectiva, pero lo limita a que los grupos no excedan el 20% de los proveedores para la especialidad o servicio en esa área geográfica en particular. 26 LPRA sec. 3103. Debido a tal limitación, las áreas geográficas juegan un papel importante al momento de formarse y aprobarse los grupos de proveedores que interesen negociar colectivamente.

Ahora bien, al reconocer que el Departamento de Salud y la Oficina de Asuntos Monopolísticos son las agencias especializadas sobre este asunto, la Ley Núm. 203-2008

delegó expresamente a éstas la tarea de definir tales áreas geográficas. Íd. Por ende, las áreas geográficas no sólo fueron delineadas por el Departamento de Salud, que es la agencia con el conocimiento especializado sobre la distribución de los servicios de salud, sino que también por la Oficina de Asuntos Monopolísticos, que es el ente gubernamental con el conocimiento especializado sobre las cuestiones antimonopolísticas. De ese modo, la delegación de poder en cuestión no sólo tuvo el fin de considerar los servicios de salud o los proveedores por cada área a ser definida, sino que también buscó evitar que esta práctica anticompetitiva afectara el libre comercio más de lo debido. Por ello, no podemos avalar la comparación que hacen los peticionarios de las áreas geográficas establecidas por el Departamento de Salud para otros asuntos, pues las que están ante nuestra consideración cumplen un propósito particular relacionado con las negociaciones colectivas de los proveedores de salud. Además, como veremos, estas áreas geográficas no son arbitrarias ni caprichosas, según aducen los peticionarios.

Del Informe rendido por la Oficial Examinadora, que recogió las incidencias de las vistas públicas sobre la Regla 91, se desprende que las regiones geográficas fueron establecidas tras un estudio minucioso del Departamento de

Salud y la Oficina de Asuntos Monopolísticos.[7] Ello, según ordenado por la Ley Núm. 203-2008. Del expediente se desprende que el criterio rector para definir las áreas geográficas fue lograr que más especialidades tuvieran la oportunidad de ser incluidas en las negociaciones, a base de la limitación del 20% establecida en la Ley Núm. 203-2008.[8]

Además, los peticionarios no nos han puesto en posición de determinar que la manera en que fueron divididas las áreas geográficas en la Regla 91 resulta irrazonable o arbitraria. Por el contrario, basan su argumento en una comparación con otras divisiones de áreas geográficas que no necesariamente guardan relación con el propósito que se persigue en la Ley Núm. 2013-2008. Asimismo, alegan que múltiples médicos-cirujanos no podrán negociar colectivamente porque no hay más de seis en su área geográfica, pero no proveen evidencia alguna sobre ello.

---

[7]Informe y recomendaciones finalizadas las vistas públicas de la propuesta Regla 91: Normas para regular el proceso de negociación colectiva entre las organizaciones de servicios de salud o administradores de terceros con los proveedores, representantes de proveedores y la creación del Panel Revisor y la Junta Revisora de Tarifas de Planes Médicos y Seguros (Informe de la Oficial Examinadora), pág. 22; Apéndice de la Petición de *certiorari*, pág. 108.

[8]Véase, Ponencia escrita ante la Comisión de Salud, R. de la C. 523, 1ra Sesión Ordinaria, 16ta Asamblea Legislativa, 2009, pág. 6 (ponencia del Hon. Ramón L. Cruz-Colón, Comisionado de Seguros).

Por lo tanto, ante el conocimiento especializado del Departamento de Salud y la Oficina de Asuntos Monopolísticos, reconocida en la propia Ley Núm. 203-2008 al delegarle esta tarea, y ante el minucioso análisis realizado por esas entidades en el descargue de esa pericia, concluimos que la división de las áreas geográficas recogida en el Art. 2.01(D) de la Regla 91, merece nuestra deferencia y, como tal, declaramos su validez.

**B.**

Por otro lado, en su Art. 2.02, la Regla 91 limita la negociación colectiva a que las partes previamente demuestren que existe un desequilibrio en la contratación. Particularmente, en su inciso (A) especifica las circunstancias en las que se considerará que habrá tal desequilibrio. Tales circunstancias son: (a) que la organización de servicios de salud tenga un poder sustancial en el negocio de seguros o planes de cuidado de salud, lo que se demostrará si su participación excede de 25,000 personas cubiertas por alguno de sus planes o del 5% del total de personas cubiertas en una determinada área geográfica y (b) que tal poder incida sobre la calidad de los cuidados de salud que ofrezcan o brinden los proveedores que interesen negociar, entiéndase, como reducir su práctica, personal, tiempo de contacto con los pacientes, entre otros.

Los peticionarios arguyen que la Ley Núm. 203-2008 no establece como requisito para la negociación colectiva el que se pruebe la existencia del desequilibrio en la contratación. Precisan que la Exposición de motivos ya reconoce tal desequilibrio, puesto que los contratos entre los proveedores y las organizaciones de servicios de salud son de adhesión. Además, sostienen que la ley habilitadora no confirió jurisdicción a las agencias involucradas para determinar este asunto.

Ante tal planteamiento, corresponde examinar la ley habilitadora a los fines de determinar si, en efecto, supedita la negociación colectiva a que las partes **prueben** el desequilibrio en la contratación. Un análisis detallado y concienzudo del estatuto nos lleva a responder en la negativa.

La Ley Núm. 203-2008 reconoce que de por sí la relación entre los proveedores de salud y las aseguradoras que dominan el mercado es desventajada. Ello, ante la realidad de que esas grandes aseguradoras pautan los términos de los contratos de adhesión, dejando a los proveedores de salud huérfanos de una posibilidad real de negociar. Así, esta desventaja en la contratación es el propósito de la negociación colectiva. Por ello, el estatuto concibe como requisito para esta negociación colectiva que esté presente el elemento del desequilibrio en la contratación.

El Art. 31.010 del Código de Seguros, introducido por la Ley Núm. 203-2008, declara que la política pública sobre esta negociación colectiva "persigue establecer un balance de competitividad en la contratación de los servicios de salud". 26 LPRA sec. 3101. En esa misma línea, especifica que "hay planes de salud que dominan el mercado, a tal grado que las negociaciones justas entre los proveedores, los administradores de terceros y las organizaciones de servicios de salud prácticamente son inexistentes e inalcanzables". Íd. Por ello, el propio estatuto hace la salvedad de que no todos los planes médicos impiden las negociaciones justas, sino que lo limita a los que dominan el mercado. A ello, añade que "**[e]n esos casos**, los administradores de terceros y las organizaciones de servicios de salud, tienen, esencialmente, el poder de establecer unilateralmente los términos de los contratos de adhesión que ofrecen a los proveedores". (Énfasis suplido). Íd. Así, nuevamente el estatuto hace hincapié en que la situación que se pretende atender no es general, sino circunscrita a esos casos donde no existe un equilibrio al momento de negociar. Finalmente, expone que "el Gobierno de Puerto Rico encuentra apropiado y necesario autorizar la negociación colectiva en cuanto a los honorarios y otros asuntos **donde se determine que existe un desequilibrio en la referida contratación**". (Énfasis suplido). Íd. Por tanto, la Ley

Núm. 203-2008 expresamente reconoce la determinación del desequilibrio como condición para la negociación colectiva.

De ese mismo modo, la Exposición de motivos indica que alrededor de cuatro aseguradoras controlan casi la totalidad del mercado de seguros y que "esas grandes compañías de seguros médicos" imponen los términos de los contratos. A su vez, reconoce la problemática de que los proveedores de salud se ven obligados a aceptar estos planes médicos para poder subsistir. Exposición de motivos Ley Núm. 203-2008 (2008 (Parte 2) Leyes de Puerto Rico 1175).

Además, todo ello surge del historial de la medida legislativa, pues los informes de ambos cuerpos legislativos reconocen el monopolio ejercido por algunas aseguradoras sobre el mercado de planes de salud local y que los proveedores que no acepten sus condiciones quedan fuera de la red de proveedores de servicios de salud.[9] Asimismo, el Diario de Sesiones de la Cámara de Representantes refleja que la intención legislativa fue controlar la práctica generalizada por parte de las

---

[9]Véase, Informe Positivo sobre el P. del S. 2190 de la Comisión de lo Jurídico, Asuntos Municipales y Financieros del Senado de Puerto Rico de 1 de noviembre de 2007, 15ta Asamblea Legislativa, 6ta Sesión Ordinaria; Informe Positivo Conjunto sobre el P. del S. 2190 de la Comisión de Gobierno y la de Hacienda y Asuntos Financieros de la Cámara de Representantes de Puerto Rico de 22 de mayo de 2008, 15ta Asamblea Legislativa, 7ma Sesión Ordinaria.

grandes aseguradoras de aumentar las primas y los deducibles y, por el otro lado, bajar las cubiertas, restringir los servicios y ofrecer pagos no competitivos a los proveedores de salud. Por ello, se concibió como viable y razonable que las grandes aseguradoras bajaran un porciento de sus millonarias ganancias en beneficio de los servicios de salud que recibe el Pueblo de Puerto Rico.[10]

Por su parte, los peticionarios argumentan que la negociación colectiva se debe extender a todas las aseguradoras, sin importar su extensión en el mercado, pues todos los contratos son de adhesión. Sin embargo, ese no es el único factor a considerar. Además de ello, la organización de servicios de salud o aseguradora con la que se pretenda negociar tiene que tener un poder sustancial en el mercado que obligue al proveedor de salud a aceptar sus términos porque, de lo contrario, los servicios de salud que ofrecen se verían limitados por la cantidad de pacientes a los que no podría tener acceso al no formar parte de esas redes de proveedores. No se trata de cualquier contrato de adhesión, sino cuando los proveedores se ven obligados a aceptar para sostener su práctica médica.

Por resultarnos atinente y persuasiva la interpretación ofrecida por la Oficina del Comisionado de

---

[10]Véase, Diario de Sesiones de la Cámara de Representantes de 19 de junio de 2008, 15ta Asamblea Legislativa, 7ma sesión ordinaria.

Seguros sobre este asunto, a continuación, transcribimos un fragmento de una de sus ponencias escritas ante la Cámara de Representantes, al momento de investigarse la implantación de la Regla 91:

> Hay que recordar que la Ley Núm. 203[-2008] pretende restablecer el balance en la contratación de servicios de salud. Para lograr este objetivo, es requisito indispensable que exista un desbalance o desequilibrio que no se puede dar por sentado, ya que no todas las organizaciones de servicios de salud tienen el poder para dictar unilateralmente los términos de los contratos, ni todos los proveedores se encuentran en una posición de desventaja. De ser este el caso, se estaría poniendo en riesgo a los aseguradores y organizaciones de servicios de salud con volúmenes limitados de negocios. Por tanto, cuando la Ley autorizó las negociaciones s[ó]lo en aquellas circunstancias donde existe un verdadero desequilibrio que opera en detrimento de los servicios prestados a los pacientes, esta Oficina lo entendió como una norma de sabia prudencia legislativa para no crear remedios más amplios que los que amerite el problema.
>
> Finalmente, si la intención de la 15ta Asamblea Legislativa hubiera sido dar por sentado el desequilibrio, no habría utilizado el lenguaje antes transcrito, que expresamente requiere que se determine su existencia. Por ello, entendemos que ante este claro lenguaje, si la intención de [e]sta Honorable Asamblea Legislativa es no requerir que se demuestre el desequilibrio, debe enmendarse el Artículo 31.010 a esos propósitos.[11]

De igual manera, la oficial examinadora plasmó en el Informe de las vistas públicas de la Regla 91, que en la Exposición de motivos de la Ley Núm. 203-2008 se reconoció que el problema con la negociación de los proveedores era

---

[11]Ponencia escrita ante la Comisión de Salud, R. de la C. 523, 1ra Sesión Ordinaria, 16ta Asamblea Legislativa, 2009, pág. 6 (ponencia del Hon. Ramón L. Cruz-Colón, Comisionado de Seguros).

provocado por unas cuantas aseguradoras y no por todas. A ello, añadió que, bajo esa premisa, la Ley Núm. 203-2008 exige que se demuestre el desequilibrio en la contratación.[12] A esos efectos, argumentó lo siguiente sobre la interpretación del Art. 31.010 de la Ley Núm. 203-2008:

> En el segundo párrafo se reconoce que hay planes que dominan el mercado. Sin embargo, hay que notar que no se refiere a que todos los planes tienen un dominio del mercado, sino menciona que hay *algunos* que dominan el mercado a tal grado que provocan la situación que pretende erradicar la Ley. La propia Exposición de Motivos menciona que son alrededor de cuatro (4) aseguradoras las que dominan el mercado a tal grado que provocan la situación que atiende la Ley. Continua diciendo, "es en esos casos", o sea, no en todos, que se tiene el poder de dictaminar unilateralmente los términos de los contratos.
>
> . . . .
>
> El lenguaje claro e inequívoco de la Ley no deja lugar para dudas en cuanto a que el texto de la Ley requiere que se haga una determinación previa de desequilibrio para autorizar la negociación colectiva. Siendo ello así se establece un "test" o escrutinio de criterios neutrales que asegura la existencia de la situación que pretende eradicar el legislador. A su vez, delimita la discreción administrativa y evita la arbitrariedad. (Subrayado en el original).[13]

---

[12]Véase, Informe y recomendaciones finalizadas las vistas públicas de la propuesta Regla 91: Normas para regular el proceso de negociación colectiva entre las organizaciones de servicios de salud o administradores de terceros con los proveedores, representantes de proveedores y la creación del Panel Revisor y la Junta Revisora de Tarifas de Planes Médicos y Seguros, pág.7; Apéndice de la Petición de *certiorari*, pág. 93.

[13]Íd., págs. 7-8; Íd., págs. 93-94.

A tenor con lo dispuesto expresamente en la Ley Núm. 203-2008 y en su historial legislativo, es forzoso concluir que se requiere determinar la existencia del desequilibrio en la contratación para la negociación colectiva. La intención legislativa fue mejorar la posición de los proveedores de salud al momento de negociar con las aseguradoras de planes médicos que tienen un poder sustancial en el mercado. Ello, pues los proveedores de salud no tienen opción de negociar sus contratos ante el desequilibrio reconocido en la Ley Núm. 203-2008. Asimismo, se ven obligados a aceptar tales condiciones, pues, de no pertenecer a la red de proveedores de estas grandes aseguradoras, su práctica profesional se volvería prácticamente inexistente. Según discutido, el propósito de esta legislación fue contrarrestar ese desequilibrio y el remedio ofrecido por la Asamblea Legislativa para ello fue la negociación colectiva.

Al interpretar todo lo anterior, las agencias aquí concernientes incorporaron en la Regla 91 el desequilibrio en la contratación como un requisito para autorizar la negociación colectiva y que el mismo debía ser probado por las partes. Así, con el fin de determinar el desequilibrio, la Regla 91 impuso dos criterios que condicionan la negociación colectiva aquí discutida. Como mencionamos, el primero, que la

organización de servicios de salud con la que se pretenda negociar tenga una participación que exceda de 25,000 personas cubiertas por alguno de sus planes o exceda el 5% del total de personas cubiertas en una determinada área geográfica y; el segundo, que tal poder incida sobre la práctica de los proveedores que interesen negociar.

Comencemos por evaluar el primer requisito que incide sobre la influencia o dominio que tiene en el mercado local la organización de servicios de salud con la que se pretende negociar. Como mencionáramos, este factor es determinante porque mientras más poder tenga la aseguradora en el mercado, menos oportunidad tiene el proveedor de rechazar su propuesta.

Respecto al margen establecido en el Artículo 2.02(A)(a) de la Regla 91, el Comisionado de Seguros explicó lo siguiente ante la Cámara de Representantes:

> Según la Exposición de Motivos, el desequilibrio surge por el excesivo poder de mercado que poseen ciertos aseguradores u organizaciones de servicios de salud. Por tanto, para que un asegurador u organización de servicios de salud tenga el poder suficiente para crear la situación de desventaja, al menos debe tener una participación sustancial en el mercado. De ahí el requisito de 5% de "market share" o de 25,000 personas cubiertas dentro de determinada área geográfica, números que contrastan con la afirmación de control total del mercado. Estos criterios, al igual, que la Ley Núm. 203[-2008], provienen de esquemas similares establecidos en otras jurisdicciones, no obstante, se ajustaron para ampliar en la medida posible el margen de la negociación. Para incrementar el universo o la base de donde se determina el 20% se consolidaron regiones de servicios de salud, de manera que más

especialidades pudieran cumplir con el límite establecido en la Ley.[14]

Además de objetivo, nos parece razonable este criterio para determinar si se trata de una aseguradora que tiene cierto dominio en el mercado al punto de, asimismo, dominar el proceso de la contratación de los proveedores. No sólo se considera el número total de participantes de ese plan médico, sino el porciento por cada área geográfica. De ese modo, se toma en consideración la particularidad de las áreas geográficas y si alguna aseguradora o plan médico ha centrado su negocio en algún área. Por ejemplo, una aseguradora que tenga menos de 25,000 participantes en total y no represente, tal vez, una influencia significativa para un proveedor de salud en alguna área geográfica, pero, esa aseguradora concentre sus participantes en otra área geográfica donde sí podría ser significativa su participación para esos proveedores.

Una vez reconocido que el desequilibrio tiene que estar presente y que es cónsono con el texto y propósito mismo de la ley habilitadora, concluimos que el criterio de los 25,000 participantes o el 5% por área geográfica no es arbitrario ni caprichoso. Sin este criterio, la determinación sobre el desequilibrio se tornaría

---

[14]Véase, Ponencia escrita ante la Comisión de Salud, R. de la C. 523, 1ra Sesión Ordinaria, 16ta Asamblea Legislativa, 2009, págs. 5-6 (ponencia del Hon. Ramón L. Cruz-Colón, Comisionado de Seguros).

arbitraria. Por tanto, **declaramos válido este criterio recogido en el inciso (a) del Artículo 2.02(A) de la Regla 91.**

Ahora bien, esa información sobre los negocios de las aseguradoras está bajo su propio control, o de la Oficina del Comisionado de Seguros. Por tanto, no está necesariamente bajo el control de los proveedores de salud, quienes son realmente los interesados en iniciar la negociación colectiva. Es por ello, que esa información no debe ser requerida a los proveedores de salud que anuncien su interés de negociar colectivamente. Más bien, esta información debe ser suplida por la entidad que fiscaliza a las aseguradoras, entiéndase la Oficina del Comisionado de Seguros.[15] Por ello, aun cuando declaramos válido el inciso anterior, **aclaramos que la carga de probar el mismo no debe recaer en los proveedores de salud que interesen negociar colectivamente.** Recae, pues, en la Oficina del Comisionado de Seguros recopilar la información necesaria para determinar si se cumple con ese criterio.

Ahora procede que evaluemos el segundo criterio impuesto en la Regla 91. Particularmente, éste exige que se pruebe cómo el desequilibrio afecta la práctica de los proveedores. Por tanto, les impone a los proveedores una

---

[15]El Art. 2.02(C) de la Regla 91 le impone al Comisionado de Seguros el deber de calcular anualmente el número de personas cubiertas por cada organización de servicios de salud en cada área geográfica.

carga probatoria no reconocida en el estatuto habilitador. Ello, pues condiciona la negociación colectiva a que los proveedores evidencien las consecuencias habidas en su práctica por el desbalance en la contratación.

Sin embargo, la propia Ley Núm. 203-2008 reconoce la situación de desventaja que tienen los proveedores frente a las aseguradoras que dominan el mercado y las consecuencias de ello. En particular, la Exposición de motivos explica que, esta situación de desventaja, afecta de forma perjudicial la calidad de los servicios que prestan los proveedores. Expone que, ante las bajas tarifas que pagan los planes médicos en comparación con los costos operacionales, los proveedores de salud se han visto forzados a aumentar el número de pacientes que atienden y disminuir su tiempo contacto. Exposición de motivos Ley Núm. 203-2008 (2008 (Parte 2) Leyes de Puerto Rico 1175).

Por ende, resulta irrazonable y contrario al propósito legislativo requerirles a los proveedores de salud que prueben esa desventaja ya reconocida per sé en la ley para condicionar su derecho a la negociación colectiva. Por ser los proveedores de salud el grupo protegido, es un contrasentido que se les requiera probar los efectos de ello en su práctica. El resultado de validar este requisito sería restringir el acceso a la negociación colectiva más allá de lo establecido en la ley

habilitadora. Por exceder el poder delegado y no ser cónsono con el espíritu de la Ley Núm. 203-2008, **declaramos <u>ultra vires</u> el criterio plasmado en el inciso (b) del Art. 2.02(A) de la Regla 91.**

A modo de recapitulación, resolvemos que el requisito del desequilibrio en la contratación es válido, pues no sólo está reconocido en la ley habilitadora, sino que incide en su propósito mismo. La política pública de "establecer un balance de competitividad en la contratación de los servicios de salud" requiere que esté presente un desbalance. Véase, 26 LPRA sec. 3101. En cuanto a los criterios para determinar el desequilibrio, validamos el criterio referente al número de participantes de las aseguradoras en el mercado local. No obstante, advertimos que tal criterio no puede ser una carga probatoria para los proveedores de salud, sino que es responsabilidad de las organizaciones de servicios de salud divulgar esa información y del propio Comisionado de Seguros requerirlas y custodiar esas estadísticas, a fin de cumplir con el mandato legislativo. Por otro lado, invalidamos que se requiera demostrar que tal poder de las organizaciones de servicios de salud afecta en la calidad de los servicios de salud que ofrecen los proveedores, pues ello ya está reconocido en la ley habilitadora.

**C.**

El Art. 2.02(B) de la Regla 91 excluye el Plan de Salud del Gobierno de Puerto Rico de la negociación colectiva de los proveedores con las organizaciones de servicios de salud. La Regla 91 menciona que tal exclusión se debe a que el plan de salud del gobierno está exonerado del Código de Seguros de Puerto Rico, en virtud de la Ley de la Administración de Seguros de Salud de Puerto Rico, supra.

En cuanto a esa exclusión, los peticionarios argumentan que la Ley Núm. 203-2008 no la contempla. Incluso, arguyen que es contraria a la intención legislativa. A tales efectos, hacen referencia a que en la Exposición de motivos se hace mención de este plan. Además, fundamentan su alegación en que su reclamo no es en cuanto a las negociaciones directamente con la ASES, sino a las realizadas con proveedores que tienen contratos con las aseguradoras que ofrecen la cubierta de Mi Salud. Así pues, los peticionarios señalan que la Ley Núm. 203-2008 no aplica cuando la ASES contrata directamente con los proveedores.

Ante tal cuadro, corresponde determinar si, acorde con la Ley Núm. 203-2008, los proveedores de salud pueden negociar colectivamente con las organizaciones de servicios de salud que ofrecen el Plan de Salud del Gobierno de Puerto Rico.

Debemos comenzar con el hecho de que la Ley Núm. 203-2008 no detalla los planes de salud que estarían incluidos en las negociaciones colectivas de los proveedores de salud. Al mantener silencio sobre la inclusión o exclusión del plan de salud estatal, debemos auscultar el historial legislativo.

En la Exposición de motivos de la Ley Núm. 203-2008, se menciona el plan de salud estatal, al reconocer que casi toda la población de este País tiene un plan médico, ya sea privado o el que ofrece el gobierno. Sin embargo, luego de tal mención, la Exposición de motivos desarrolla y centra su argumento en las compañías de seguros privadas, sin hacer referencia al plan de salud gubernamental. Más aun, como mencionáramos, resalta que cuatro aseguradoras controlan el mercado local de los seguros y que "[e]sas grandes compañías de seguros médicos **convertidas en corporaciones, con fines de lucro**, dominan el mercado y dictan y establecen los honorarios y tarifas de forma unilateral . . .". (Énfasis suplido). Ley Núm. 203-2008 (2008 (Parte 2) Leyes de Puerto Rico 1174). De este modo, la ley se refiere a los planes de salud privados con fines de lucro, contrario al plan de salud del gobierno que es administrado por una corporación pública, con un fin público. 24 LPRA sec. 7001.

A su vez, del historial legislativo de la Ley Núm. 203-2008 también se deprende que no fue la intención

incluir el plan de salud estatal en estas negociaciones. En un momento dado, la ASES se concibió como un ente regulador de este proceso de la negociación colectiva, al igual que la Oficina del Comisionado de Seguros y la Oficina de Asuntos Monopolísticos. El Informe Positivo del Senado sobre el Proyecto 2190 incluyó a la ASES como uno de los entes gubernamentales que participarían del proceso de la reglamentación y de la aprobación de las alzas de las primas, junto al Departamento de Justicia y al Comisionado de Seguros.[16]

Ahora bien, la Cámara de Representantes decidió descartar la ASES como un ente regulador del proceso de la negociación colectiva. En el Diario de Sesiones en la Cámara de Representantes, se dejó meridianamente claro que el plan de salud estatal no formaría parte de estas negociaciones colectivas. La entonces Representante, Hon. Jenniffer González Colón, presentó y discutió el Proyecto de ley en el hemiciclo, previo a su aprobación.[17] Ante la preocupación de uno de sus compañeros legisladores sobre la inclusión de la ASES, entre otras entidades, en estas negociaciones colectivas, se aclaró que el plan de salud

---

[16]Informe Positivo sobre el P. del S. 2190 de la Comisión de lo Jurídico, Asuntos Municipales y Financieros del Senado de Puerto Rico de 1 de noviembre de 2007, 15ta Asamblea Legislativa, 6ta Sesión Ordinaria.

[17]La Hon. Jenniffer González Colón era la Presidenta de la Comisión de Gobierno, quien junto con el Hon. Antonio Silva Delgado, presentó el Informe Positivo Conjunto de la Cámara de Representantes para el Proyecto del Senado 2190.

del gobierno no formaría parte de las mismas. A continuación, lo allí expresado:

> SR. RIVERA AQUINO: Okey. En el caso de lo que es la ACCA [sic], el Fondo del Seguro del Estado, ASSES [sic], están estos también vinculados a lo que es esa (cotización).
> SRA. GONZALEZ COLON: Este Proyecto no cobija ninguna…
> SR. PRESIDENTE ACC. (JIMENEZ NEGRON): Adelante compañera.
> SRA. GONZALEZ COLON: Muchas gracias. **Esta medida no contempla ninguna de las negociaciones de la Reforma de Salud, porque eso va a subasta.** Por lo tanto, eso es gobierno. Ni lo que es ACCA [sic], ni lo que es el Fondo, **ni lo que es ASSES** [sic], **están incluidos en esto.**
> SR. RIVERA AQUINO: Finalmente, le pregunto…
> SRA. GONZALEZ COLON: De hecho, habían unas enmiendas del grupo de aseguradoras para que incluyéramos a todos esos grupos, pero no fueron aceptadas por la Comisión precisamente porque eso pudiera generar, es un Proyecto piloto, y yo creo que todavía no tenemos la capacidad de evaluar cuánto, cómo va a funcionar en términos de por ciento para aventurarnos a incluir todas las regiones. (Énfasis suplido). Diario de Sesiones de la Cámara de Representantes de 19 de junio de 2008, 15ta Asamblea Legislativa, 7ma sesión ordinaria, pág. 153.

De lo anterior, es forzoso concluir que la intención legislativa fue excluir el plan de salud del gobierno de estas negociaciones colectivas. Los legisladores consideraron el hecho de que la ASES para dar los servicios contrata con organizaciones de servicios de salud, a través de un proceso de subasta. Por tanto, concibieron que los proveedores de salud no pueden negociar con las organizaciones de servicios de salud asuntos ya pactados por la ASES.

Contrario a la Ley Núm. 203-2008, una legislación posterior, la Ley Núm. 228-2015, proveyó expresamente la posibilidad de incluir el plan de salud del gobierno en las negociaciones colectivas, pero en ese caso, sólo para las cooperativas de proveedores de servicios de salud (CPSS). 5 LPRA sec. 4516j(b). Esta legislación más reciente incluyó al plan de salud del gobierno en las negociaciones colectivas de las CPSS, distinto a la Ley Núm. 203-2008 donde los legisladores diáfanamente en su discusión lo excluyeron de las negociaciones colectivas de los proveedores de salud. Si el legislador hubiese querido la inclusión del plan de salud estatal en las negociaciones colectivas de los proveedores de salud, así lo hubiera hecho, según lo hizo en la Ley Núm. 228-2015. Como se ha reconocido, al legislador no le podemos atribuir actuaciones sin fin alguno. Pueblo v. Pizarro Solís, 129 DPR 911, 928 (1992). Por consiguiente, en este caso en particular, la inclusión expresa en la ley posterior denota la exclusión del plan de salud en la ley previa, que tenemos hoy ante nuestra consideración.[18]

---

[18]Además, debemos recordar que la ley orgánica de la ASES descarta la jurisdicción y reglamentación del Comisionado de Seguros sobre las organizaciones de servicios de salud que contratan con ella. 24 LPRA sec. 7026. Ello, pues establece que la ASES será responsable de fiscalizar la capacidad y efectividad de estas organizaciones. Íd. Mientras, la Ley Núm. 203-2008 precisamente enmienda el Código de Seguros para añadir un nuevo capítulo sobre la negociación colectiva entre los proveedores y las organizaciones de servicios de salud. Además, el Comisionado de Seguros es el ente fiscalizador

A tenor con todo lo anterior, disponemos que el Plan de Salud del Gobierno de Puerto Rico está excluido de las negociaciones colectivas autorizadas por la Ley Núm. 203-2008, con excepción de las CPSS, según reconocido expresamente en la Ley Núm. 228-2015.

**D.**

Por su parte, el Art. 2.03(B) de la Regla 91, atiende el asunto de los representantes de proveedores. Así, aclara el marco de tal representación y los requisitos para ser un representante. Los peticionarios plantean que la Regla 91 impone requisitos no contemplados por la Ley Núm. 203-2008, referentes a la edad, escolaridad, alfabetismo y moralidad, los cuales, alegan, están en conflicto con el propio estatuto. No les asiste la razón.

La Ley Núm. 203-2008 define el término representante de proveedor de la siguiente manera:

> [U]n tercero, autorizado por el proveedor para negociar a su nombre, con las organizaciones de servicios de salud, los términos y condiciones contractuales entre las partes y el proveedor, que deberá tener:
>
> (a) Autoridad y facultades que le son conferidas.
> (b) Término para ejercer dicha función.

de tales negociaciones y tiene la responsabilidad de que los resultados de la negociación cumplan con el Código de Seguros. 26 LPRA 3104. Es decir, esta negociación colectiva se rige por el Código de Seguros y su Comisionado. Al no ser extensiva tal jurisdicción sobre las organizaciones de servicios de salud que contraten con la ASES, el plan de salud administrado por esta última no debe concebirse como parte de las negociaciones colectivas autorizadas en la Ley Núm. 203-2008.

(c) Método válido para hacer constar la delegación de dicho poder o facultad.
(d) **Persona con autoridad para conferirle facultades.**
(e) Validez del contrato.
(f) **Responsabilidad civil exigible, y a quién obliga.** (Énfasis suplido). 26 LPRA sec. 3102(6).

Por su parte, el Art. 2.03(B) de la Regla 91 complementa lo anterior y especifica que el aspirante a representante debe cumplir con: ser mayor de edad; saber leer y escribir; tener el diploma de escuela superior; no haber sido convicto de un delito que implique deshonestidad o depravación moral.

Al examinar ambas disposiciones, es forzoso concluir que los requisitos impuestos en el Art. 2.03 están relacionados con la función de representar a un grupo de proveedores en un proceso de negociación con las organizaciones de servicios de salud y procurar que la persona tenga cierta responsabilidad civil ante tan delicada función. A su vez, les ofrecen mayor certeza al proceso y mayor protección a los mismos proveedores, quienes delegarán la negociación colectiva autorizada en ese representante. Contrario a lo argüido por los peticionarios, no se trata de requisitos adicionales no contemplados en la ley orgánica, sino que la Regla 91 ofrece especificidad a los criterios generales provistos en la Ley Núm. 203-2008. Más aun, no se tratan de requisitos arbitrarios o caprichosos, sino que son razonables para el propósito de la ley.

A tenor con lo anterior, concluimos que los requisitos impuestos en el Art. 2.03 para ser representantes de proveedores no son ultra vires y, por el contrario, son cónsonos con la definición dada en la ley habilitadora.

### E.

Los Art. 3.03 y 3.12 de la Regla 91 los discutiremos en conjunto por relacionarse ambos con la autoridad del Comisionado de Seguros sobre el proceso de las negociaciones colectivas entre los proveedores de salud y las organizaciones de servicios de salud. El Art. 3.03 de la Regla 91 establece que el Comisionado de Seguros será quien autorice el inicio de las negociaciones, siempre y cuando, se cumplan con todos los requisitos. Además, que impartirá las instrucciones a seguirse en el proceso. Por su parte, el Art. 3.12 atiende la parte final de la negociación, al establecer que el Comisionado de Seguros deberá impartir su aprobación al contrato logrado por las partes. Esto bajo el criterio de que los beneficios sociales o en pro de la competencia superen los efectos negativos de la práctica anticompetitiva. A su vez, ejemplifica ciertos escenarios a considerar por el Comisionado para ese fin.

Los peticionarios argumentan que tal delegación de poder al Comisionado es ultra vires, pues no se desprende de la ley habilitadora. Sobre los criterios para aprobar el acuerdo final entre las partes, los peticionarios arguyen que son arbitrarios por no guardar una relación racional con la Ley Núm. 203-2008. No estamos de acuerdo.

Como muy bien reconoce su Exposición de motivos, la Ley Núm. 203-2008 es una excepción a la política antimonopolística, al permitir la agrupación de proveedores de salud para negociar con las organizaciones de salud, lo cual vulnera la libre competencia en el mercado. Asimismo, reconoce tal excepción por tratarse de un asunto de política pública, a saber, lograr que los proveedores de salud no continúen en desventaja al momento de negociar con las grandes aseguradoras y las implicaciones que ello conlleva en los servicios de salud de nuestro País. Por tratarse, precisamente, de un asunto de política pública resulta más que razonable, indispensable, la supervisión activa del Comisionado de Seguros en estos procesos. La propia Exposición de motivos cataloga la intervención y la fiscalización del Comisionado como "salvaguarda" del Estado. Ello, para que se asegure que los procesos se lleven a cabo según el propósito mismo del estatuto. A su vez, el Comisionado tiene la obligación de proteger la naturaleza de estas negociaciones, las cuales finalmente repercuten en los

servicios de salud que tendrán a su disposición los ciudadanos. De igual modo, podemos percibir del historial legislativo que, al conferirle al Comisionado de Seguros la tarea de supervisar y fiscalizar las negociaciones colectivas, se tuvo la intención de una participación activa del Estado en estos procesos. No menos importante, el rol del Comisionado garantiza el cumplimiento de los requisitos jurisprudenciales discutidos en materia de prácticas anticompetitivas.

Respecto a los criterios sobre los beneficios sociales y los efectos anticompetitivos del contrato acordado entre las partes, colegimos que son razonables. Al tratarse de una excepción a las leyes antimonopolísticas, el acuerdo final entre las partes tiene que cumplir con el fin de la política pública que establece la ley, que en este caso sería mejorar los servicios de salud. Al ponderar estos criterios, como la implantación de programas preventivos, el incentivarse adelantos médicos, la inversión en la infraestructura o el acceso a la prestación de los servicios de salud, el Comisionado de Seguros garantizará que estos acuerdos no sólo mejoren la posición de los proveedores de salud al momento de negociar, sino que incidan sobre la calidad de los servicios de salud. Esto redunda en el objetivo final de la Ley Núm. 203-2008, que es mejorar los servicios de salud del Pueblo.

Es por todo lo anterior, que disponemos que los Arts. 3.03 y 3.12 de la Regla 91, que tratan sobre el poder del Comisionado de Seguros en el proceso de estas negociaciones colectivas, son válidos.

**IV**

Tras un análisis sosegado de todas las disposiciones aplicables, resulta forzoso concluir que los Artículos aquí examinados, excepto el Art. 2.02(A)(b) y la carga probatoria impuesta a los proveedores en el inciso (a) de tal Artículo, cumplen con el propósito de la Ley Núm. 203-2008 y la política pública allí establecida.

En virtud de lo que antecede, modificamos la Sentencia emitida por el Tribunal de Apelaciones a fin de declarar el inciso (b) del Art. 2.02(A) de la Regla 91 del Comisionado de Seguros nulo y aclarar que la carga probatoria establecida en el inciso (a) del Art. 2.02(A) no debe recaer en los proveedores de salud.

Se dictará Sentencia de conformidad.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Colegio de Médicos-Cirujanos de Puerto Rico, Asociación de Laboratorios Clínicos, Inc.<br><br>    Peticionarios<br><br>       v.<br><br>Academia de Medicina de la Familia; Academia de Medicina General; Asociación de Hematología y Oncología de Puerto Rico; Asociación de Quiropráctico de Puerto Rico; Colegio de Cirujanos Dentistas de Puerto Rico; Pain Management Academy of Puerto Rico, Inc.<br><br>    Interventores<br><br>Hon. Ángela Weyne Roig, en su capacidad de Comisionada de Seguros; Hon. César R. Miranda Rodríguez, en su capacidad de Secretario de Justicia; Hon. Ana del C. Ríus Armendaris, en su capacidad de Secretaria de Salud<br><br>    Recurridos | CC-2016-676 | Certiorari |

SENTENCIA

San Juan, Puerto Rico, a 7 de noviembre de 2018.

En virtud de lo que antecede, se modifica la Sentencia emitida por el Tribunal de Apelaciones a fin de declarar el inciso (b) del Art. 2.02(A) de la Regla 91 del Comisionado de Seguros nulo y aclarar que la carga probatoria establecida en el inciso (a) del Art. 2.02(A) no debe recaer en los proveedores de salud.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez y la Juez Asociada señora Rodríguez Rodríguez no intervinieron.


                        Juan Ernesto Dávila Rivera
                        Secretario del Tribunal Supremo